**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

**ABIGAIL M. LEGROW**
MASTER IN CHANCERY

**NEW CASTLE COUNTY COURTHOUSE**
**500 NORTH KING STREET, SUITE 11400**
**WILMINGTON, DE 19801-3734**

Final Report: June 24, 2015
Submitted: March 11, 2015

Scott E. Swenson, Esquire
Connolly Gallagher LLP
The Brandywine Building
1000 West Street, Suite 1400
Wilmington, DE 19801

Richard H. Cross, Jr., Esquire
Cross & Simon, LLC
1105 North Market Street, Suite 901
Wilmington, DE 19899

      Re:   *IMO the Last Will & Testament of Wilma B. Kittila, deceased*
                C.A. No. 8024-ML

Dear Counsel:

On February 18, 2015, I issued my final post-trial report in this action. In that report, I recommended that the Court enter judgment against petitioners and in favor of the estate regarding the validity of Wilma Kittila's last will and testament. None of the parties took exception to that report, but the petitioners filed a motion for an award of attorneys' fees and costs. The parties briefed that motion. This letter is my final report on the petitioners' motion.

The factual background of this case is explained at length in my final post-trial report and will not be repeated here. To briefly summarize, Karen Kittila ("Karen") and her son, Christopher Kittila (collectively with Karen, "Petitioners"), filed a petition claiming that the last will and testament of Wilma B. Kittila ("Wilma") was invalid for lack of testamentary capacity, undue influence, or because the terms of a guardianship order precluded Wilma from making a will without the approval of her guardians. Karen's deceased husband, Allan Kittila ("Allan"), was Wilma's nephew by marriage, and Allan, Karen, and their four children enjoyed a close relationship with Wilma for much of her life. Although Wilma previously named Allan, Karen, and their children as beneficiaries of the residue of her estate, Wilma began exhibiting personality changes in 2000 or 2001. She became angry with Allan for reasons she never coherently explained and began expressing unusually strong feelings about a neighbor, Boyce Fender, who had helped her around her home. Wilma eventually visited a lawyer with the apparent intent of rewriting her will and removing Allan, Karen, and their children as beneficiaries. Before Wilma completed that process, however, Karen filed a petition to be appointed Wilma's guardian. In that petition, Wilma's doctor opined that Wilma required a guardian because she suffered from delusional thought disorder, schizoid personality/affect, and decreased reasoning ability.

Wilma contested the petition and a hard-fought guardianship case proceeded for approximately six months, until the parties eventually agreed that Wilma's neighbors, Michael and Carol Leach, would be appointed her guardians. The guardianship order required the guardians to inform Karen about significant changes to Wilma's health. Shortly after the guardianship order was entered, Wilma executed a will (the "2004 Will") leaving her estate to a combination of Mr. and Mrs. Leach, Mr. Fender and his wife, and two charities. Wilma expressly stated in the 2004 Will that she intentionally was not making any bequests to Allan, Karen, or their children.

After the guardianship case concluded, the Kittila family did not see or speak to Wilma for the remainder of her life, aside from a chance encounter between Karen and Wilma shortly before Wilma died. Wilma's guardians assisted her with important life decisions, including the sale of her home and her move to an independent living apartment, and also helped Wilma manage her finances. I concluded after trial that Wilma largely maintained her independence despite the guardianship order, and that she was self-sufficient until late 2010 or early 2011, when she began experiencing a noticeable mental decline. In 2009, Wilma executed a new will (the "2009 Will") in which she increased the portion of her estate devised to the Leaches and the Fenders, changed the named executor from Mr. Fender to Mr. Leach, and added a third charity as a beneficiary.

Wilma left her independent living apartment in May 2012 and never returned. Instead, she was hospitalized a number of times, was admitted to an assisted living facility and hospice, and ultimately died on October 19, 2012. The cause of death on her death certificate is listed as dementia. When Karen happened upon Wilma in a hospice unit in August 2012, Wilma did not recognize Karen and seemed docile but completely demented. The Leaches did not notify Karen or her children of Wilma's death, but when the family saw Wilma's obituary in the newspaper, Karen's son Theodore ("Ted") called Mr. Leach. During that conversation, Mr. Leach falsely told Ted that Wilma's estate was small and that Mr. Leach was not sure whom Wilma designated as beneficiaries in her will. Upon learning of Wilma's 2009 Will, the Petitioners filed this action contesting its validity.

Mr. Leach, as executor to the estate, moved to dismiss the petition, a motion I recommended that the Court deny. The Petitioners filed an amended petition in April 2013 challenging both the 2009 Will and the 2004 Will. After a three day trial and post-trial briefing, I issued a report recommending that the Court deny the Petitioners' challenge to the will. I reasoned that, although the Petitioners' contentions regarding Wilma's capacity and susceptibility to influence were not without evidentiary support, they had not shown by a preponderance of the evidence that Wilma lacked capacity when she executed the 2009 Will, or that she

was unduly influenced to make that will. I also concluded as a legal matter that the guardianship order did not require Wilma's guardians to approve her will.

The Petitioners did not take exception to that report, but filed a "Motion for Leave to File Fee Petition and for Award of Attorneys' Fees and Costs" (the "Motion"). In the Motion, the Petitioners argue that, although they ultimately were not successful in contesting the will, the Court has discretion to require the estate to pay the Petitioners' attorneys' fees and costs. The Petitioners rely on a line of cases recognizing that even an unsuccessful challenger to a will may seek an award of attorneys' fees if the challenger can demonstrate "probable cause plus exceptional circumstances." The Petitioners contend they more than meet this standard. The estate opposes the Motion, arguing that the Petitioners have not shown either probable cause or exceptional circumstances and that this case is not one of the rare instances in which the Court will award attorneys' fees to an unsuccessful litigant.

Under the "American Rule," parties are responsible for paying their own attorneys' fees, regardless of their success on the merits of a claim.[1] There are a number of exceptions to that rule recognized under Delaware law, including the exception that permits a court in a "proper case" to impose on the estate the

---

[1] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

attorneys' fees incurred by a party who unsuccessfully contests a will.[2]  To invoke

that exception, an unsuccessful contestant must show he had probable cause to

contest the will and that exceptional circumstances justify ordering the estate to

pay the contestant's fees and costs.[3]  I believe the Petitioners have met this

standard.

To establish that they had probable cause to challenge the wills, the

Petitioners must show that the evidence they produced was "sufficient to establish

a prima facie case, and overcome the presumption of law that always exists in

favor of the will's validity … and justify the court in believing that the paper

writing in issue is not the will of the deceased, if no other evidence should be

produced."[4]  That is, if I consider only the Petitioners' evidence, and not the

evidence presented by the estate, did the Petitioners present a prima facie case that

the challenged wills were invalid?  I believe that they did.  First, as I noted in my

final report, the Petitioners had justifiable cause to bring this case and presented a

fair amount of support for their position, including the expert report and testimony

of an experienced psychiatrist, the evidence of Wilma's abrupt and unexplained

change of heart toward Allan and the rest of the family, Wilma's strange

---

[2] *In re Estate of Newell*, 1977 WL 23836, at *1 (Del. Ch. Dec. 20, 1977).
[3] *Ableman v. Katz*, 481 A.2d 1114, 1120 (Del. 1984); *In re Will of Cammock*, 1995 WL 805161, at *1 (Del. Ch. Oct. 20, 1995).
[4] *Ableman*, 481 A.2d at 1118.

statements and behavior leading up to the guardianship proceeding, and the fact Wilma ultimately died from dementia. Although the evidence the estate presented, which was more contemporaneous with Wilma's execution of the 2009 Will, demonstrated that Wilma had testamentary capacity and was not susceptible to undue influence, I believe the Petitioners established a prima facie case for their claims.

That showing alone, however, is not sufficient. The Petitioners also must establish that the case involved exceptional circumstances demonstrating "the special equities which would make a failure to shift the burden onto the estate unfair."[5] The Delaware Supreme Court has held that an action "benefiting an estate" or one in which a contestant was successful after trial but ultimately lost on appeal are examples of exceptional circumstances. Other circumstances that may qualify as exceptional, depending on the facts of the case, include occasions when a testatrix disinherits a blood relative in favor of a stranger, materially alters a prior testamentary scheme, or relies on legal advice from an interested party.[6] The presence of one or more of these factors does not, however, create a presumption

---

[5] *Scholl v. Murphy*, 2002 WL 31112203 (Del. Ch. Sept. 4, 2002).
[6] *Ableman*, 481 A.2d at 1120-21.

of exceptional circumstances.[7]  Rather, the Court evaluates each case based on its unique facts.[8]

The Petitioners contend there are several "exceptional" circumstances at work in this case.  First, the Petitioners argue that this action benefited the estate by clarifying the proper beneficiaries of the estate.  The same, however, could be said of every challenge to a will.  This Court's precedent establishes that the "benefiting the estate" factor applies when an action clarifies an ambiguous testamentary scheme, which is not the case here.[9]  The Petitioners also argue that this case was exceptional because Wilma disinherited a blood relative in favor of strangers, materially altered her previous testamentary scheme, and signed a will that benefited her guardians, who served as her fiduciaries.  In my view, the combination of:  (1) Wilma's unexplained and abrupt termination of a decades-long loving relationship with the only "family" with whom she maintained any ties, (2) Wilma's material alteration to her previous testamentary scheme shortly after a guardianship was imposed over her person and property, (3) Wilma's bequests to her guardians, a charity suggested by her guardians, and another couple with whom the guardians were close, (4) the guardians' failure the alert the Kittila family to Wilma's failing health and ultimate death, and (5) Mr. Leach's false

---

[7] *In re Will of Macklin*, 1991 WL 67799, at *2 (Del. Ch. Apr. 17, 1991).

[8] *Ableman*, 481 A.2d at 1120; *In re Will of Macklin*, 1991 WL 67799, at *2.

[9] *Scholl*, 2002 WL 31112203, at *3.  *Cf. In re Will of Macklin*, 1991 WL 6799, at *3.

statements to the family regarding Wilma's estate and his knowledge of her will constitute exceptional circumstances in this case. Although I ultimately concluded that Wilma had testamentary capacity and was not susceptible to undue influence, that conclusion was neither easy nor readily apparent at the outset of this case, and the unusual circumstances of Wilma's bizarre behavior, the imposition of a guardianship and the attendant fiduciary responsibilities of the guardians, and the executor's false statements to Ted make this case one in which the estate should bear some portion of the cost for the challenge to the will.

In previous cases addressing shifting fees for an unsuccessful will contest, the Delaware courts have compared the relative size of the estate to the amount of the fee request.[10] Petitioners have not indicated how much they seek in the way of attorneys' fees, nor do I have a precise figure for the size of Wilma's estate. It may be, when the parties have presented those figures, that I will conclude that the estate only should be required to pay a portion of the fees associated with Petitioners' challenge. I therefore am directing the parties to meet and confer regarding those figures to attempt to reach an agreement regarding the amount of fees to be paid by the estate.[11] If the parties cannot agree, the Petitioners should

---

[10] *See, e.g. Ableman*, 481 A.2d at 1120; *Scholl v. Murphy*, 2002 WL 3112203, at *3; *In re Estate of Newell*, 1977 WL 23836, at *2 (Del. Ch. Dec. 20, 1977).

[11] Even if the estate intends to take exception to my recommendation that the estate pay any of Petitioners' fees and expenses, the parties nevertheless should try to reach a

submit a fee petition within 20 days of the date of this report, the estate should file its response within 14 days of the filing of the fee petition, and the Petitioners should file their reply within 7 days of the filing of the estate's response.

For the foregoing reasons, I recommend that the Court grant the Motion and allow the Petitioners' counsel to submit a fee petition.  This is my final report.  The period for taking exceptions to this report shall be stayed until the parties stipulate to, or I issue a final report regarding, the amount of fees to be paid by the estate.

Respectfully submitted,

*/s/ Abigail M. LeGrow*

Master in Chancery

---

stipulation regarding the amount of fees to be paid by the estate, with the estate reserving its right to take exception to this report.